IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 12 |
| JIM FUELLING and | ) |
| JULIE A. FUELLING, | ) |
| | ) Bankruptcy No. 18-00644 |
| Debtors. | ) |
| | ) |

**RULING ON CONFIRMATION OF CHAPTER 12 PLAN, MOTION TO USE CASH COLLATERAL, AND MOTION FOR RELIEF FROM STAY**

This matter came before the Court for hearing on January 9, 2019. Ronald Martin and Aaron Blair of Day Rettig Martin, P.C. appeared for Debtors Jim and Julie Fuelling ("Debtors"). Peter Chalik of Whitfield & Eddy, P.L.C. appeared for Agrifund, LLC ("ARM"). Wesley Huisinga of Shuttleworth & Ingersoll, P.L.C. appeared for Freedom Bank. Carol Dunbar appeared for herself as Chapter 12 Trustee. The parties requested time to file post-hearing briefs. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G), (L), and (M).

### STATEMENT OF THE CASE

Debtors propose a Chapter 12 Plan under which they would use the remaining 2017 crop sale proceeds covered by ARM's lien to start a cattle feeding operation. Debtors propose to use proceeds from the cattle operation and rental payments from their bins and related equipment to make plan payments. Creditors

Freedom Bank and ARM object to Debtors' Plan, arguing that it impermissibly treats secured property under 11 U.S.C. § 1225(a)(5), is not feasible, and was not proposed in good faith.  The Court finds the Plan is not confirmable.  It does not comply with § 1225(a)(5) and is not feasible.  Debtors' Motion to Use Cash Collateral is denied.  ARM's Motion for Relief from Stay is granted because the secured crop proceeds are not necessary to an effective reorganization.

## STATEMENT OF THE FACTS

Debtors are small family farmers who live in Clayton County, Iowa.  They have farmed in some capacity their entire married life.  They have at various times milked dairy cows, raised row crops, and fed livestock.  Debtors currently live on four and a half acres of land which includes their homestead, a machine shed, a bin site, and a small feedlot with an outbuilding.

Debtors' primary lender, Freedom Bank, holds a first priority lien in all of Debtors' assets except for their Ford F150 pickup and the remaining cash proceeds from the 2017 crop sale.  Several years ago, Debtors began to face losses in their farming operation.  Freedom Bank declined to extend additional financing and encouraged Debtors to liquidate assets.  Debtors sold some assets but sought to continue the farming operation.  To fund inputs for the 2017 crop year, Debtors

turned to ARM.  ARM obtained a subordination agreement from Freedom Bank, giving ARM a $151,000 first priority lien in the 2017 crop sale proceeds.

Proceeds from the 2017 crop year were not sufficient to repay ARM in full or continue making payments to Freedom Bank.  Debtors were unable to obtain financing for the 2018 crop year.  They filed this Chapter 12 bankruptcy in May of 2018.  Debtors sold all of the 2017 crops and various equipment.  They used the proceeds to pay their secured creditors.  ARM's remaining claim is $107,506.45, $66,625.37 of which is secured by the remaining 2017 crop sale proceeds still held by Debtors.  The parties have stipulated that Freedom Bank's secured claim is $214,093.86 for purposes of plan confirmation.

ARM filed a Motion for Relief from Stay in August 2018.  It seeks permission to collect the remaining 2017 crop sale proceeds held by Debtors.  In September 2018, Debtors filed a Motion to Use Cash Collateral.  Debtors seek permission to use the crop sale proceeds to start a cattle feeding operation and, in exchange, grant ARM a lien in the cattle and feed.  Hearing on the motions was originally scheduled for October 17, 2018. On the day of hearing, the parties met with the Court and agreed to continue the matters.  The parties agreed to give Debtors until November 21 to file a Chapter 12 Plan and to take up the pending motions at the Plan confirmation hearing.

Debtors filed a Plan in which they propose to use the remaining crop sale proceeds to purchase cattle and feed, giving ARM a replacement lien. Debtors propose to use profits from the cattle operation, as well as rental payments from the grain bins on their property, to make interest payments to ARM and Freedom Bank for five years. Under the Plan, the entire principle of the loans would come due as a balloon payment at the end of the plan period. ARM, Freedom Bank, the Chapter 12 Trustee, and the Iowa Department of Revenue objected to confirmation. Debtors eventually resolved the objections of the Chapter 12 Trustee and the Iowa Department of Revenue.

The Court held a confirmation hearing on January 9, 2019. Marty McLaughlin with the U.S. Attorney's office appeared briefly and stated that, due to the government shutdown happening at the time, he was not authorized to appear. He noted that the Internal Revenue Service and the U.S. Department of Agriculture might want to file objections to the Plan at a later date. The Court stated that it would proceed with the hearing but consider any additional objections at the time they were made. No additional objections have been made.

# DISCUSSION

**1. Confirmation of Debtors' Chapter 12 Plan**

Debtors must establish the six required elements under 11 U.S.C. § 1225 for the Court to confirm the Plan. In re Michels, 301 B.R. 9, 13 (Bankr. N.D. Iowa, 2003) (citing In re Szudera, 269 B.R. 837, 842 (Bankr. D.N.D. 2001)). Freedom Bank and ARM argue that Debtors have failed to satisfy three of these elements: (1) treatment of collateral under § 1225(a)(5), (2) feasibility under § 1225(a)(6), and (3) good faith under § 1225(a)(3). The Court addresses those objections in that order.

**a. Treatment of Secured Claim-§ 1225(a)(5)**

A plan can satisfy confirmation standards for a secured claim in one of three ways under § 1225(a)(5). That section provides that:

> with respect to each allowed secured claim provided for by the plan—
> (A) the holder of such claim has accepted the plan;
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or
> (C) the debtor surrenders the property securing such claim to such holder

11 U.S.C. § 1225(a)(5). Both Freedom Bank and ARM object to the Plan, so § 1225(a)(5)(A) is not satisfied. The Plan also does not satisfy § 1225(a)(5)(C) because it does not provide that the secured property will be turned over to the creditors. Debtors attempt to satisfy § 1225(a)(5)(B) and must do so for the Plan to satisfy this confirmation standard. Section 1225(a)(5)(B) contains two subparts, both of which must be satisfied.

### i. Section 1225(a)(5)(B)(i)

ARM argues that the Plan's treatment of its $66,625.37 secured claim in the cash proceeds Debtors hold from the 2017 crop sale does not comply with § 1225(a)(5)(B)(i). Section 1225(a)(5)(B)(i) states that the Plan must provide that the holder of a secured claim "retain the lien securing such claim." 11 U.S.C. § 1225(a)(5)(B)(i). Debtors propose using the cash proceeds securing ARM's claim to purchase fifty head of cattle and the required feed and give ARM a substitute lien in the cattle and feed.

ARM objects and argues that § 1225(a)(5)(B)(i) should be strictly construed and the specific lien it has in crop sale proceeds must be retained. ARM argues that § 1225(a)(5)(B)(i) does not allow the Plan to substitute a lien in different collateral, even if the substitute lien is in collateral with equal or greater value.

Debtors argue that § 1225(a)(5)(B)(i) allows liens to be substituted so long as the substituted collateral is of equal or greater value.

Debtors and ARM both rely on In re Hanna, 912 F.2d 945 (8th Cir. 1990). In Hanna the creditor had a security interest in the debtors' herd of cattle. Id. at 947. Under the proposed plan in that case, the debtors would continue the cattle operation and use the proceeds to fund the plan. The creditor objected, arguing § 1225(a)(5)(B)(i) was not satisfied because its security interest in the livestock was not retained. The Eighth Circuit found that, in the case of livestock farmers, § 1225(a)(5)(B)(i) should not be read so literally that debtors must maintain the lien in the exact same animals. Id. at 950. That court found that "the intention of Congress in enacting Chapter 12 was to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land. The literal application of § 1225(a)(5)(B)(i) gives livestock farmers no such chance." Id. (internal quotations omitted).

The Eighth Circuit concluded that, in the case of livestock farmers, the language "retain the lien" in § 1225(a)(5)(B)(i) means the lien in the livestock herd, rather than the individual animals that comprise the herd. Id. "'The fact that the particular animals comprising the herd change over time will not matter so long as the creditor retains its lien on the herd and the value of the creditor's claim can

7

be appropriately protected.'" Id. (quoting R. Rogers & L. King, Collier Farm Bankruptcy Guide ¶ 4.08[2][b], at 4–95 (1989)).

In Hanna, the debtors' plan purported to sell the market ready cattle and use the proceeds to purchase new cattle and pay off other creditors. Hanna, 912 F.2d at 947. The Court noted that before this sale and purchase of new cattle, the herd was worth approximately 120% of the creditor's claim. Id. It further noted that after the sale, the value of the herd would be approximately equal to the creditor's claim. Id. The Hanna court then noted that, while the animals comprising the herd may change over time:

> . . . the plan must provide that the value of the herd will be maintained at a level sufficient to ensure that the creditor will recover the balance remaining on its claim in the event the debtor defaults on plan payments. The determination of the appropriate margin of protection must take into account the risk of fluctuations in livestock prices during the repayment term.

Id. at 951.

Debtors in Hanna alternatively proposed to give the creditor a second mortgage in real estate. Id. at 947. The court noted this would leave the creditor with liens covering collateral with a combined value of approximately 165% of its claim–an increased equity cushion of 45%. Id. In spite of this, the court found that substituting a new lien did not comply with § 1225(a)(5)(B)(i). Id. at 952. It concluded that, while § 1225(a)(5)(B)(i) may be interpreted broadly, the

8

substitution of a lien in entirely new collateral "calls for a construction of [§ 1225(a)(5)(B)(i)] which renders Congress' use of the words 'the lien' all but meaningless." Id.

Here, Debtors proposal to use ARM's cash collateral to purchase cattle and feed and give ARM a replacement lien in that cattle and feed fails to satisfy § 1225(a)(5)(B)(i) under Hanna. Debtors attempt to stretch the somewhat flexible definition of § 1225(a)(5)(B)(i) in Hanna beyond what the Eight Circuit provided. Debtors here are not attempting to continue an on-going cattle operation by selling individual animals but maintaining the lien in the herd. Instead, they are attempting to substitute ARM's lien in cash resulting from crop sales for a lien in livestock. A substitute lien in entirely different collateral does not satisfy § 1225(a)(5)(B)(i) under Hanna because it "carries with it different risks than [the lien] for which [ARM] had bargained." Hanna, 912 F.2d at 952.

Even if Debtors originally had a livestock operation they were trying to continue, the Plan would not satisfy § 1225(a)(5)(B)(i). A livestock farmer may sell and replace cattle while maintaining a lien in the herd as a whole, but "must provide that the value of the herd will be maintained." Id. at 951. The Plan must also "take into account the risk of fluctuations in livestock prices during the repayment term." Id. The Plan here is deficient because it proposes to use all of ARM's cash collateral in the purchase of the livestock and feed with no additional

9

cash going into the operation. Moreover, even though the value of the cattle will grow over time as the cattle consume the feed, there will be a period when the less liquid cattle are necessarily worth less than the cash used to purchase them. This would not maintain the value of ARM's lien. Additionally, Debtors' Plan does not provide ARM with an equity cushion in the cattle to account for the risk of fluctuations in livestock prices. Debtors' Plan does not comport with § 1225(a)(5)(B)(i) in its treatment of ARM's secured claim.

Freedom Bank also objects to the Plan under § 1225(a)(5)(B)(i) arguing it impermissibly modifies Freedom Bank's lien in Debtors' grain storage facilities. Freedom Bank has a lien in all Debtors' equipment and real property. This includes Debtors' grain bins, grain augers, and dryers. Under the Plan, Debtors propose to rent the grain bins and related equipment and then use the rental income to fund plan payments. Freedom Bank asserts that its security interest extends to any rents received from the lease of its secured property, and any use of those rent payments not agreed to by Freedom Bank impermissibly modifies its lien in violation of § 1225(a)(5)(B)(i).

Debtors do not dispute that Freedom Bank's security interest covers the bins and related equipment. They also do not dispute that Freedom Bank's security agreement includes "proceeds" such as rent payments. Debtors argue, however, that Freedom Bank's security interest does not extend to property acquired after

Debtors filed their bankruptcy petition. Debtors argue that rent payments constitute post-petition property not unencumbered by Freedom Bank's lien.

Under 11 U.S.C. § 552(a), a prepetition security agreement does not cover property acquired after the commencement of the case. 11 U.S.C. § 552(b) provides certain exceptions to this rule. Section 552(b)(1) provides that security agreements covering "proceeds, products, offspring, or profits of such [prepetition secured] property" shall continue to cover such property even if it come into the bankruptcy estate post-petition. 11 U.S.C. § 552(b)(1).

This Court has previously held that "proceeds, products, offspring, or profits" of secured property as used in § 552(b)(1) includes rent payments derived from secured property. In re Civic Partners Sioux City, LLC, 2013 WL 5534743 at *25 (Bankr. N.D. Iowa 2013). Freedom Bank's security agreement thus continues to cover rents derived from the bins under § 522(b)(1).

The proposed Plan thus fails to satisfy § 1225(a)(5)(B)(i) in two ways. First, it impermissibly attempts to substitute ARM's lien in the remaining 2017 crop sale proceeds for a lien in cattle and feed. Second, the Plan proposes to use rents derived from grain bins and equipment covered by Freedom Bank's blanket lien to make payments to creditors other than Freedom Bank.

### ii. Section 1225(a)(5)(B)(ii)

While the failure to satisfy subsection (i) is dispositive, Freedom Bank has also argued the Plan fails to satisfy subsection (ii) of 1225(a)(5)(B). Subsection (ii) provides that, in addition to retaining secured creditors' liens, the Plan must provide that "the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtors under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1225(a)(5)(B)(ii). In other words, in addition to retaining a secured creditor's lien, the Plan must provide the secured creditor "with a stream of payments which has a present value equal to the allowed amount of the claim." In re Michels, 301 B.R. 9, 16 (Bankr. N.D. Iowa, 2003) (citing In re Szudera, 269 B.R. 837, 843 (Bankr. D.N.D. 2001)). To satisfy § 1225(a)(5)(B)(ii), Debtors must pay secured creditors interest at an equitable interest rate under the Plan. Michels, 301 B.R. at 16.

The Eighth Circuit follows a "market rate" approach to calculating interest under § 1225(a)(5)(B)(ii). U.S. v. Doud, 869 F.2d 1144, 1145 (8th Cir. 1989). The method for calculating the "market rate" starts with a base rate of the U.S. treasury bond yield of the same maturity. Id. at 1146. The Court then adjusts this rate upwards by adding a "risk premium." Id. at 1146. Courts have frequently applied a 2% upward adjustment to reflect the proper risk premium but may apply

a greater adjustment depending on the risk involved in the particular case. Michels, 301 B.R. at 17.

Here Debtors followed the prevailing approach, starting with a treasury bond rate of 2.88% and adding a 2% upward adjustment for a total interest rate of 4.88%. Freedom Bank argues that this interest rate is below actual market rate and does not properly account for the level of risk present in this case. The Court disagrees and finds an interest rate of 4.88% is equitable and satisfies § 1225(a)(5)(B)(ii).

Freedom Bank also argues that the Plan fails to satisfy § 1225(a)(5)(B)(ii) because the Plan states the amount of Freedom Bank's secured claim at $201,622.91 when the parties have stipulated that the amount is $214,093.86. Freedom Bank notes that this discrepancy leaves the proposed interest payments to Freedom Bank short by $1,447.78. The Court agrees and finds the Plan fails to comply with § 1225(a)(5)(B)(ii).

The Plan proposed by Debtors fails to satisfy § 1225(a)(5)(B)(i) and (ii). These conclusions are dispositive. The Court, however, will address all the remaining arguments on confirmation to further clarify the record for any future proceedings.

### b. Feasibility

Freedom Bank and ARM also argue that the Plan fails to satisfy § 1225(a)(6) which requires that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). This is commonly referred to as the feasibility requirement. "The Eighth Circuit's feasibility test considers whether provisions in a plan are achievable given the unique facts of the case." Michels, 301 B.R. at 17 (citing In re Bowman, 253 B.R. 233, 238–39 (B.A.P. 8th Cir. 2000)).

Freedom Bank and ARM call into question Debtors' ability to maintain the cattle operation, the accuracy of Debtors' projected income and expenses, and Debtors' ability make the balloon payment at the end of the Plan.

At trial the creditors questioned Mr. Fuelling at length about his health and its impact on his ability to maintain a cattle operation. Debtors have argued that any consideration of Mr. Fuelling's disabilities would violate Iowa Code § 216.10, Iowa's disability discrimination act. The creditors argue Iowa Code § 216.10 is not applicable in this instance. The Court need not determine the applicability of § 216.10 here. Even if Mr. Fuelling's health is properly considered, Mrs. Fuelling and Debtors' son Justin both testified to their willingness and ability to assist Mr. Fuelling in whatever ways needed. The Court accepts that testimony and any

remaining arguments about the human resources available to maintain a cattle operation are unnecessary.

Freedom Bank and ARM next argue the Plan is not feasible because the projections provided are not supported by the record. In particular, they argue that that Debtors' projected income from the grain bin rental and cattle operation is overstated, and their expenses are understated. Based on the record provided, the Court finds that Debtors' projections are overly optimistic. The Plan, for example, makes many assumptions that are not realistic including: that the grain bins will be leased out at full capacity for the entire plan period, that the cattle herd will have a 98% survival rate, and that the price of cattle and feed will remain steady throughout the Plan period. The Plan simply does not fairly account for the risk inherent in any farming operation. It is possible that everything will go nearly perfectly as the Plan projects. The standard for feasibility, however, is not whether the Plan is possible, but rather "if it has a rational likelihood of success." Michels, 301 B.R. at 17. This Plan as written does not meet that standard.

ARM and Freedom Bank also argue the plan is not feasible because it relies on a balloon payment at the end. The Plan payments during the entire five-year term cover only the interest on Freedom Bank and ARM's secured claims. The principal is to be paid in one balloon payment at the end of the five-year period. "[A]ny plan that includes a balloon payment to a creditor is suspect of

15

confirmation unless there is proof of circumstances likely to produce a bucket of cash at just the right time to make the payment." Michels, 301 B.R. at 17 (internal quotations omitted).

Debtors argue money for the balloon payment will come from the proceeds of the cattle operation. The Court has already rejected Debtors' overly optimistic assumptions but, even assuming Debtors' optimistic cash flow projections would hold, the cattle operation will not produce sufficient profits over five years to make a $280,719.23 balloon payment. Debtors seem to acknowledge as much at trial. Debtors were both questioned about their ability to make the balloon payment. They both testified that they planned to secure alternative financing, or they would sell to their son and use the sale proceeds to pay secured claims. Debtors, however, produced no evidence that either of these sources are likely to occur. They simply cannot show there is a likelihood of "a bucket of cash at just the right time" to make the balloon payment.

The Court recognizes that the purpose of a reorganization plan under Chapter 12 is to "give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." Justice v. Valley Nat. Bank, 849 F.2d 1078, 1090 (8th Cir. 1988) (quoting H.R.Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249). The Court further recognizes the importance of this property to Debtors and their family. Debtors,

16

however, have been unable to produce the evidence necessary to meet even the minimal feasibility standards. The Plan as written is not feasible.

### c. Good Faith

Freedom Bank also argues that the Plan is not confirmable under § 1225(a)(3) because Debtors did not propose it in good faith. Freedom Bank points out that in similar circumstances this Court has previously held there was a lack of good faith where debtor's proposed plan was an attempt to delay payment rather than a serious effort at reorganization. Michels, 301 B.R. at 18. Although the Debtors' Plan in the present case is not confirmable for a number of reasons, the Court does not believe it was proposed for an impermissible purpose, and certainly was not proposed in bad faith. The Court has no doubt that Debtors genuinely believe that they could make the Plan work. Section 1225(a)(3) is not a basis for denying Plan confirmation.

### 2. Motion to use Cash Collateral

Before filing the Plan, Debtors had filed a Motion to Use Cash Collateral. That Motion requested permission from the Court to use the 2017 crop sale proceeds, which are fully encumbered by ARM's secured claim, to purchase cattle and feed. That Motion was still pending at the time of confirmation. A debtor may only use cash collateral if the creditor consents or the Court authorizes the use

of cash collateral.  11 U.S.C. § 363(c)(2).  On request of a party with an interest in the property, the Court shall "prohibit or condition such use. . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  ARM objected and requested adequate protection.

The Court need not conduct an additional full analysis of Debtors' cash collateral motion.  The Court has already found a profitable cattle operation is not feasible and that Debtors' use of the cash collateral to fund a cattle operation would impermissibly modify ARM's lien under § 1225(a)(5)(B)(i).  There is no need consider Debtors' proposed use of the cash proceeds further here.  Debtors' Motion to Use Cash Collateral is denied.

### 3. ARM's Motion for Relief from Stay

ARM also filed a Motion for Relief from Stay asking the Court for permission to pursue recovery of the remaining 2017 crops proceeds.  That motion was pending at confirmation and is ready for ruling.  The Bankruptcy Code provides that, on request of an interested party, the Court shall grant relief from stay to pursue recovery of property if "the debtor does not have an equity in such property; and such property is not necessary to an effective reorganization."  11 U.S.C. § 362(d)(2).  "'A decision to grant or deny a motion for relief from the automatic stay is within the discretion of the bankruptcy court.'"  In re Meinders,

18

Case 18-00644 Doc 144 Filed 05/01/19 Entered 05/01/19 10:18:56 Desc Main
Document Page 19 of 20


2016 WL 1599508 at *5 (Bankr. N.D. Iowa 2016) (quoting <u>Blan v. Nachogdoches Cty. Hosp. (In re Blan)</u>, 237 B.R. 737, 739 (B.A.P. 8th Cir. 1999)).

The parties do not dispute that Debtors have no equity in the 2017 crop sale proceeds. Debtors claim that the proceeds are necessary for an effective reorganization. The Court has concluded it is not feasible for Debtors to reorganize. The Court also has concluded that using the 2017 crop sale proceeds to purchase cattle and feed would impermissible modify ARM's lien in violation of § 1225(a)(5)(B)(i). The Court does not see any possible reorganization plan under which Debtors could avoid this same problem. The cash proceeds are, therefore, "not necessary to an effective reorganization" because they cannot be used in any plan of reorganization. ARM's Motion for Relief from Stay is granted.

## CONCLUSION

**WHEREFORE**, confirmation of Debtors' proposed Chapter 12 Plan is DENIED;

**FURTHER**, Debtors' Motion to Use Cash Collateral is DENIED;

**FURTHER**, ARM's Motion for Relief from Stay is GRANTED.

Dated and Entered:

May 1, 2019

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE